**IN THE COURT OF APPEALS OF IOWA**

No. 24-0191
Filed May 22, 2024

**IN THE INTEREST OF A.W., J.B., and K.W.,**
**Minor Children,**

**T.L., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Joan M. Black, Judge.

A mother appeals the termination of her parental rights to three children. **AFFIRMED.**

Kristin L. Denniger, Mount Vernon, for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Sue Kirk of Arnott & Kirk, PLLC, Iowa City, attorney and guardian ad litem for minor children.

Considered by Tabor, P.J., and Badding and Buller, JJ.

**BULLER, Judge.**

The mother appeals termination of her parental rights to three children: A.W. (born 2014), J.B. (2020), and K.W. (late 2022). (The children have different fathers, each of whose rights were also terminated; none of the fathers appeal.) After reviewing the history of this case—including the ups and downs of the mother's progression and regression—we affirm.

**Background Facts and Proceedings.** The Iowa Department of Health and Human Services (HHS) began investigating the family in early 2022 for two reasons. First, a report from the mother's probation officer that the mother kept marijuana in the home in a place accessible to the children. And second, a report from another source that the mother left the children in the care of an intoxicated family member and had not arranged to pick them up.

An HHS worker conducted a safety assessment of the mother's home and discovered a child's training "potty" filled with feces and urine on the ground in the living room, a plastic fork in a child's crib, and a knife on the kitchen counter. During this assessment, J.B. fell off a bed and the mother "flung" the child by one arm back onto the mattress. HHS had also confirmed that A.W. was truant and rarely attended school. The mother was uncooperative with this assessment, much as she had been during previous HHS encounters, including one report of A.W. ingesting marijuana. She yelled profanity at the worker in front of police and children and resisted releasing information or participating in services.

At the time of this assessment, the mother was on probation for child endangerment and assault. Her other criminal history mostly consists of non-violent offenses such as theft, providing false identification information, trespass,

criminal mischief, harassment, and public intoxication. And she had a history of prior involvement with HHS, including a confirmed child-abuse assessment in 2018. She had violated probation multiple times and had at least one outstanding warrant as of the assessment. In late February, the mother was jailed—on a probation violation and new charges—for two weeks.

HHS attempted to arrange family preservation services after her release; the mother made an appointment but then wasn't home when the worker arrived at the scheduled time. About a month later, the mother no-showed for a meeting with her probation officer. The mother failed to appear at court hearings removing the children from her care and adjudicating them as children in need of assistance (CINA). The children were placed with their maternal grandmother.

Following adjudication, the mother participated in some services and attended some weekly visits with her children. But providers noted she was not meaningfully engaged with the children and talked on her phone through visits. She remained "very angry" that the children had been removed. The mother's participation gradually improved somewhat, she obtained new housing, and she completed a substance abuse evaluation.

The mother appeared in court for the first time at the permanency hearing. The juvenile court granted the mother six months of additional time to work toward reunification, and the court expressed "optimism" that a "corner had been turned" and the family could reunify successfully. But the court also ordered the mother to complete a psychological evaluation and follow any recommendations. The mother gave birth to K.W. shortly after, and she progressed to semi-supervised

visitation with the other children. Providers observed generally improved visits, including the mother interacting with A.W. about school and homework.

In late 2022 and early 2023, police responded to multiple domestic-disturbance calls originating from the mother's home. HHS became concerned that family members were smoking marijuana in the mother's home and that K.W.'s father had an altercation with the mother while she was holding the infant. When HHS attempted to investigate, the mother was again uncooperative and would not allow the department access to K.W.

The juvenile court ordered K.W.'s removal. At the hearing, the mother admitted other adults were smoking marijuana in her home while K.W. was present and that she had been in a violent confrontation while holding K.W. She specifically admitted to biting and stabbing K.W.'s father with a key in front of the child. The juvenile court observed that the mother blamed police for not obtaining a no-contact order between herself and K.W.'s father. And the court found a "lack of insight" on the mother's part, in that she did "not . . . grasp the significance of her inability to display protective capacity towards her children."

Before K.W.'s removal, the mother had progressed to overnight visits with A.W. and J.B. But after the issues that prompted removal of K.W., visits returned to fully supervised. Initially these visits did not go well, with the mother refusing to engage and leaving at least one visit after only ten minutes. The situation improved some over time, but the mother continued to struggle with her mental health. A provider noted some issues with the mother's inattentiveness, including her paying attention to one child while another was trying to eat candy out of the trash can and playing with scissors. And the mother struggled to supervise all three children

on her own. HHS informed the mother she needed to attend therapy to address her "anger and aggression," work on "healthy relationships," and discuss "her choices that lead to her children not being safe with her."

The State petitioned to terminate the mother's rights to all three children, but then moved to continue the scheduled trial and requested authorization for a trial home placement in light of the mother's recent progress. The trial home placement never happened, despite HHS efforts to make arrangements with the mother. Around the same time, the grandmother moved out of state and the children were moved to foster placements. As the HHS worker put it, things "went downhill" after the grandmother moved. The HHS worker opined the grandmother was "doing a lot more work" than anyone realized.

Although the mother was scheduled for overnight visits in August, the visits were cancelled because the mother was not home when the visits were scheduled to begin, and she became combative with HHS. The mother shouted and cursed at workers, and she withheld information about her whereabouts, schedule, and who was living with her. She also resisted engaging with mental-health therapy, only attending two sessions.

Visits returned to fully supervised after these setbacks, and the mother's participation again grew inconsistent. She stopped attending most of the children's medical appointments and refused to approve therapy for one of the children— requiring HHS to step in with court approval. She similarly refused to sign visitation expectations. The court appointed special advocate (CASA), who had previously supported reunification, changed her recommendation to termination.

The mother testified at trial and described her housing and employment situation. She explained that she worked third shift, but—as the juvenile court put it—"[h]er testimony got confusing when the topics of her work schedule and childcare were raised." At one point, when unable to explain how she could care for the children after an all-night shift without another person to help or childcare, the mother said she had "trained" her body to not need sleep. When asked how she was trying to improve her mental health, she said "definitely not therapy," which she described as "pointless." She also admitted she was required to attend domestic violence programming but had not done so. In response to a question about whether the children could be safely placed with her, the mother responded "umm, maybe, yeah" and gave meandering answers about people that could potentially help provide childcare while she worked. When her attorney asked if she would cooperate with HHS going forward, the mother said: "I guess."

Overall, the juvenile court described the mother's trial testimony as "somewhat combative and impatient," noting at times the mother "appeared angry and frustrated" or "emotional." In an exchange the juvenile court described as "enlightening," the mother discussed her interactions with the children during visits and explained, "I'm grown; I'm an adult. I'm not going to play with little kids' toys and sit and pretend." The mother also said she did not think her inconsistent visits and erratic behavior over the life of the case had any effect on the children, even though workers and the guardian ad litem (GAL) recognized that the children were upset or "devastated" over missed visits. Despite this, the mother acknowledged her "attitude" had been a problem. She also described her bond with the children, which the juvenile court ruling noted when describing the mother's "deep and

abiding love for [her] children." The mother ended her testimony by declaring: "What more do you all want? Because I've done everything already."

HHS workers testified that the mother had progressed and regressed throughout the case. The workers identified the key points of regression as the domestic-violence incident with K.W.'s father, the grandmother moving away, and the mother reacting poorly to an HHS meeting after missing more than a month of visits. A worker described the mother's behavior at that meeting as "out of control," "cussing after every sentence," and "very, very angry."

The department identified the mother's mental-health issues—and related inability to regulate her emotions, temper her anger, or accept feedback—as the biggest barrier to reunification. According to the department, these concerns were almost entirely unaddressed: the mother did not consistently attend mental-health therapy, wouldn't sign case plan expectations or provide a work schedule, and overall refused to engage in services that would remedy parenting deficits. The mother also resisted mental-health and speech therapy for the children, contending "they don't need those services."

The county attorney, the children's GAL, the CASA, and HHS all recommended termination of parental rights at trial. The juvenile court terminated the mother's parental rights to A.W. under Iowa Code section 232.116(1)(f) (2023), and to J.B. and K.W. under section 232.116(1)(h). The mother appeals, and we review de novo. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).

**Statutory elements as to A.W. and J.B.** The mother first challenges termination of her rights to A.W. and J.B. under section 232.116(1)(f). The court terminated the mother's rights to J.B. under paragraph (h), not paragraph (f), based

on the child's age (three years old at the time of termination). *Compare* Iowa Code § 232.116(1)(f)(1), *with id.* § 232.116(1)(h)(1). But we recognize our analysis of the mother's argument as to A.W. applies equally to J.B.

The only element the mother challenges is whether the children could be returned to her custody at the time of trial. *See id.* § 232.116(1)(f)(4), (h)(4). This is the entirety of her argument:

> Regarding the case at hand, [the mother] believes that her children can absolutely be returned to her care. She testified at the termination trial that she has stable housing, they have rooms to come home to, she has a plan to get them to school and to care for them. [The mother] does not feel that the State has proven by clear and convincing evidence that A.W. and J.B. cannot be returned to her at the present time.

Much like in her testimony at trial, the mother fails to reckon with the core concerns preventing reunification: her mental-health struggles, unreliability and disorganization (particularly when it came to arranging childcare), failure to engage with services, and lack of insight into how her lack of progress endangered her children. The mother also fails to address her struggles to provide adequate care for the children on her own during two-hour visits, which forecasted poorly for full-time care. The mother's "plan" to care for the children was, at best, confusing. And we note at the time of trial the mother had regressed for a second time to fully-supervised visits because of her behavior, which generally weighs against her argument the children could safely be returned to her immediate care. As the GAL put it in her report, "Cancelling visits weeks before the termination trial really shows that the children are not a priority." We agree with the juvenile court A.W. and J.B. could not safely be returned to the mother's custody as of trial.

**Statutory elements as to K.W.** The mother first questions whether K.W. was "actually adjudicated" CINA as to the mother. *See id.* § 232.116(1)(h)(2). We appreciate the candor displayed by the mother's attorney, as she acknowledges that all involved understood a written adjudication had been entered. This is confirmed by the juvenile court's termination ruling, which specifically indicated that adjudication was ordered on April 17, 2023. We agree with the mother that no formal written adjudication was entered as to her. But, because CINA adjudications are child-specific rather than parent-specific, and there is no question K.W. was adjudicated with reference to K.W.'s father, we discern no reversible error on this basis. *See In re S.G.*, No. 22-1248, 2022 WL 10804241, at *3 (Iowa Ct. App. Oct. 19, 2022) ("A child is either in need of assistance or is not, and the request for adjudication is either granted or denied accordingly. There isn't a separate adjudication for each parent.").

The mother also separately challenges whether K.W. could be returned to her custody as of the termination trial, and we reject this claim for the same reasons we rejected it as to A.W. and J.B.

**Best interests.** The mother contests whether termination was in the best interests of the children. On review, we give primary weight "to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

The mother argues that removal was traumatizing for the children, and HHS "should have forgiven her outburst at the meeting and followed through with the original plans for trial home placement." To the extent this is an adequate best-

interests argument, we reject it. As the State observes in its response to the mother's petition, this is "one of those unfortunate cases in which a parent progresses and regresses, the progress is not enough to have the children returned to their care, and matters simply reach a point at which the child's best interests command permanency and stability." *See In re I.S.*, No. 20-0976, 2020 WL 6481088, at *4 (Iowa Ct. App. Nov. 4, 2020). The need for stability is particularly strong here, where the mother has already squandered a six-month extension of time and a continuance of the termination trial, and is no closer to reunification today—indeed, perhaps farther—than she was when additional time was granted. We also recognize the record shows the children were upset when the mother failed to follow through on planned visits, which highlights the need for stability in the future. Consistent with the arguments made by the CASA and GAL, we find termination in these children's best interests.

**Permissive bond exception.** A single sentence of the mother's petition urges she believes "irreparable harm will come to the children's mental health if that bond is now severed permanently." To the extent that sentence was intended to invoke appellate review of the permissive bond exception, this "sprinkled" mention of an issue without analysis is insufficient. *See, e.g.*, *In re J.R.*, No. 22-1470, 2023 WL 2148760, at *3 (Iowa Ct. App. Feb. 22, 2023). And even if the claim was properly briefed, we would reject it because the mother has not carried her burden to prove by clear and convincing evidence that any harm caused by severing the bond outweighs the stability and safety afforded by termination and adoption for the reasons we have already expressed in this opinion. *See* Iowa Code § 232.116(3)(c) (the statutory permissive bond

exception); *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (noting we consider the parent-child bond in the context of a case's unique circumstances and the child's best interests).

**AFFIRMED.**